Judge Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR22-160RSM |
| Plaintiff, | ) ) | |
| v. | ) ) | DEFENDANT'S SENTENCING MEMORANDUM |
| JUSTIN COSTELLO, | ) ) | |
| Defendant. | ) ) | |

Mr. Costello respectfully requests that this Court follow the joint recommendation in the plea agreement and sentence him to ten years of imprisonment. The Probation Department's recommendation fails to sufficiently recognize Mr. Costello's early acceptance of responsibility, limited criminal history, and the unique nature of the trading loss amount ($25 million) in this case. The two experienced Assistant U.S. Attorneys handling this case were aware of all of the information in the Presentence Report when the plea was entered in this case. The AUSA's had met with witnesses/victims and offered a plea that adequately contemplated all the harm committed by Mr. Costello. For his part, Mr. Costello pled guilty shortly after he arrived in this district without so much as a trial continuance.

//

//

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

I.      **INTRODUCTION**

A ten-year prison term is warranted for the following reasons:

- Mr. Costello, age 42, has very limited criminal history. His only prior convictions were two misdemeanor cases involving alcohol use, one of which was dismissed after completion of a deferred prosecution.

- The offense conduct took place over a three-year period and does not reflect a lifelong course of conduct. Mr. Costello does not have a history of similar criminal behavior. By all accounts, Mr. Costello was an ethical and successful businessperson for many years prior to the offense conduct. The support letters submitted by those who have known him for years describe a thoughtful and ambitious man who somehow lost his way. In this respect, his conduct is aberrant when his entire life is considered.

- Mr. Costello quickly took responsibility after counsel was appointed. Mr. Costello was arrested near San Diego and arrived in this district on November 18, 2022. Dkt 9. As expected, the discovery in this case was voluminous. He pled guilty on January 18, 2023, before counsel could review all of the discovery and without a trial continuance. The facts in the plea agreement track, for the most part, the relevant conduct described in the indictment; nothing was taken off the table by the government as part of the plea agreement.

- Mr. Costello's early plea saved the government and the Court significant resources. Large complex fraud cases such as this typically take years to resolve either by plea or trial. By pleading guilty early, Mr. Costello put an end to litigation so that he, the government, and the victims could quickly move on. His guilty plea will essentially dispose of civil cases filed against him and his companies. He has agreed to waive his right to contest the restitution and loss amounts included in the plea agreement.

- The advisory guideline range overstates the seriousness of the offense and the fraud guidelines have been widely criticized for decades.

- The agreed upon loss amount, approximately $35 million, does not represent the proceeds Mr. Costello received as a result of his offense conduct. Most of the loss, $25 million, is the result of trading losses from investors in one of his companies, GRNF.[1] There is no evidence Mr. Costello sold his shares of GRNF. The actual financial gain to Mr. Costello from the fraudulent activity was a small fraction of the overall loss amount.

---

[1] GRNF is the ticker symbol for GRN Holdings.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

- A ten-year sentence is consistent with other large fraud cases in this district and a longer sentence would create an unwarranted sentencing disparity.

## II.   BACKGROUND

### A.   Mr. Costello's Early Life.

Mr. Costello was born in the working-class city of Rockford, Illinois to Dennis and Ann Costello. His mother Ann states that Mr. Costello was "always a happy child and had such sweetness and kindness about him" and he "would always help out his grandparents with such unconditional love to give." Exhibit 1 (Support Letters). Mr. Costello's father worked as a corporate sales manager – a position that Mr. Costello describes as instilling in him a desire to enter into the business world. Yet, Mr. Costello's interest in business stems back from an even earlier generation.

Mr. Costello's maternal grandfather was a hard-working, traveling seed salesman whose dream was to someday own his own storefront. His grandfather hoped that this would allow him to reduce his business travels and spend more time with his family. After years of hard work, Mr. Costello's grandfather achieved this dream. However, he tragically passed away from a sudden heart attack in the family home. This left Mr. Costello's grandmother with a new business she knew little about along with a new home and the responsibility of a mortgage. Fortunately, Mr. Costello's aunt and uncle both stepped in to run the new family business and to support the family for years to come. Likely, this background had a large effect on Mr. Costello's outlook on success, business, and how to support one's family. Mr. Costello's cousin Daniel Pawlus believes that the "shadow of Ann's father remained with the family for many years", both in positive "Midwestern work-ethic kinds of ways", and also in the realm of "unrealized dreams." Exhibit 1. Pawlus and Mr. Costello "were encouraged to follow [their] own paths and talents as [they] built our lives." *Id*.

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Mr. Costello's talents and potential are often mentioned by his loved ones. Pawlus notes that from an early age, Mr. Costello was blessed with many gifts. "When he channeled his gifts in a positive direction[,] they resulted in bringing opportunity, joy and a sense of accomplishment to those engaged in his service and community-minded endeavors." Exhibit 1. One of Justin's strengths was his communication abilities and sense of humor. This made him a natural leader in a number of school activities, including student government. Mr. Costello later mounted a campaign for state political office in his early twenties.[2] Although he lost to his opponent, Mr. Costello worked hard to make a case to serve his constituents. *Id.* Through all these endeavors, he sought to bring a sense of dedication and pride in accomplishment, as well as a desire to include those he loved. *Id.*

Support letters for Mr. Costello reiterate that he has goodness within him and a lot of positive things to offer if his energy and abilities are channeled in a positive and lawful direction. *Id.* His family and friends believe that, upon his release from prison, Mr. Costello will work to make amends and seek forgiveness from those he harmed and work to start his life again. Most importantly, Mr. Costello himself is certain of this.

### B.    Mr. Costello's Early Career.

Mr. Costello's actions in this case are a recent development in his business career. Before this offense, Mr. Costello worked legitimately in various roles. Mr. Costello worked for an industrial and buildings materials company called Fastenal. First starting out in management by taking over the lighting division, Mr. Costello performed well and moved up quickly. He soon moved into business development and sales, in

---

[2] PSR ¶77 has a few facts that are slightly inaccurate. Mr. Costello ran for a Minnesota State *house* seat, not a senate seat as stated in the PSR. He felt that one of the reasons he lost was his drinking citation. He did a political internship while in school in Minnesota, not Cambridge, and never ran for office in Cambridge.

charge of the European division of the company. As a result, he spent the next few years abroad.

In 2007, wanting to be closer to his family, Mr. Costello resigned from Fastenal. Once back in the US, he was hired as Vice President of Spectrum Management – a corporation that specialized in energy management products and services. His hard work there quickly landed him the position of CEO. Despite his hard work and initial success, Spectrum failed in the fallout of the 2008 recession. Mr. Costello was greatly impacted by this business failure, feeling responsible for the many employees who lost their jobs. Having a brief flash of high-level success only to lose it all suddenly due to the market crash had a significant effect on Mr. Costello.

In 2012, Mr. Costello was hired by Inland Northwest Construction Company, a construction supply company in Spokane. He worked there for approximately two years as their general manager. Although he was working very hard in this role, Mr. Costello had his eyes set on the prospect of his own new enterprise. In 2014, he started GRN Funds as a capital management and banking services company. He aimed to bring capital markets to underserved industries. However, the business soon became overwhelming, with the workload and stress of the company turning tumultuous. The mounting fear of impending failure slowly returned, reminding Mr. Costello of the failures of Spectrum. To make matters worse, the 2020 COVID pandemic added more stress and uncertainty. Feeling he had to "make it work" for his clients and employees, Mr. Costello's business practices soon became fraudulent. Reflecting on this, Mr. Costello states, "I should have dealt with all of this responsibly and head on. Instead, I started telling lies." PSR, Mr. Costello's letter to the court.

Mr. Costello attributes his "absurd ego, even megalomania, the pull of the money, and what was at stake" as the drive for his descent into fraudulent business practices. *Id*. He thought he "could just keep things afloat by lying until business

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 5

FEDERAL PUBLIC DEFENDER
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

stabilized." *Id*. He was blinded by the glamour and by the money. "It seemed so easy, so within reach; to be somebody, to make my family proud, to make my friends proud, to make myself proud. To prove to myself that I am capable, that I am worthy of respect, that I am good enough." *Id*.

Mr. Costello recognizes that his actions during that time period deserve punishment. He believes that he is capable of being wiser, stronger, and more mature. He states:

> I was raised to be a better person than this. I know that I can grow from all of this. I will not let my failings here define me. I will not let this whole experience pass me by repressed and unexamined. The coming years will be years of contemplation, and of moral and spiritual strengthening. It will be a chance for me to pause and internalize everything that I have done and continue to learn the lessons that I need to learn to never again falter as I have. Because who I was during this last chapter of my life was not who I was meant to be, not who I am, not who I want to be, not how I want my son to view me as a man.

*Id*.

### C.   Mr. Costello's History of Philanthropy and Generosity.

The support letters for Mr. Costello reiterate his generosity and passion for charity work. Benjamin Cadranel has seen Mr. Costello demonstrate his commitment and service to his communities. Exhibit 1 (Support letters). Mr. Cadranel serves as the Chair for the Yolo County Library Foundation, the City of Woodland Manufactured Home Fair Practices Commission Chair and is on the board of the Yolo County Court Appointed Special Advocates. *Id*. Mr. Cadranel has collaborated professionally with Mr. Costello on many projects serving the public interest and has seen Mr. Costello donate his time and money to multiple charities serving underserved women and children, such as Toys for Tots and Mary's Place (a local nonprofit that shelters victims of abuse and provides them housing, clothing, job training, and counseling). *Id*. In addition to donating money, Mr. Costello donates his time to support elders in his

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 6

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

community, particularly former veterans needing assistance with rides to doctors' appointments. *Id*. Mr. Costello has also volunteered his personal time through mentorship and speaking engagements. *Id*.

Armoni Easley, CEO of non-profit Project Optimism, echoed similar views about Mr. Costello. Exhibit 1. Project Optimism fosters optimism through personal and professional development services and community engagement, such as kindergarten to college programs/curriculums and educational consulting. *Id*. After meeting Mr. Easley, Mr. Costello was excited about helping and connecting with Project Optimism to make a difference for kids in Sacramento and Los Angeles. *Id*. On their first call together, Mr. Costello asked many questions and wanted to know how he could help the organization attain its goals. *Id*. Mr. Costello did more than donate money, he also got involved and offered to come and talk to the kids and meet the team members. *Id*. Unlike many busy people, Mr. Costello followed through on his promises. *Id*. He showed up with his wife, Katrina, and spent time on campus learning about the program and their team. *Id*. He spoke to the kids and shared his story to help inspire them to do well in school so that they can achieve their dreams and do greater good for humanity. *Id*. Mr. Costello's time, resources, and generosity had a positive impact on the lives of these kids. *Id*. Mr. Easley states that Mr. Costello is "a special person with a big heart and wants to have a good effect on the world." *Id*. Mr. Easley believes that Mr. Costello is someone who has "learned his lesson and will come out of this focusing on making the community and world around him a better place." *Id*.

Other letters of support catalogue similar stories of genuine care for others. Mr. Costello's friend Mitchell Setlow, nephew of Congresswomen Bella Abzug and descendent of a family of social activists, believes that once he has served his time, Mr. Costello will work to focus his intelligence on making the world a better place. *Id*. Mr. Setlow gives many examples of Mr. Costello's generosity that inspires this belief. *Id*.

1    Mr. Costello worked to find a more rewarding job for Mr. Setlow's daughter; he

2    volunteered to consult with a number of Mr. Setlow's peers and ex-employees to assist

3    in their career goals; and he made phone calls to family and friends enduring specific

4    struggles to check in on them. *Id*. When Mr. Setlow was battling cancer, Mr. Costello

5    would often visit and encourage him. *Id*. Mr. Setlow believes that Mr. Costello was in

6    awe of people that made a difference outside of just elevating one's wealth. *Id*. Overall,

7    Mr. Setlow is confident that Mr. Costello will work to redeem himself by

8    acknowledging his mistakes and repaying those he has harmed in a meaningful way. *Id*.

9        **D.    Mr. Costello is a loving husband and a recent father.**

     Mr. Costello is both newly married and a new father. His son was born in 2020.

10   However, in Mr. Costello's words, "as everything seemed to line up for me, I lost

11   control of it all again." PSR (Mr. Costello's Letter to the Court). Due to his actions, Mr.

12   Costello knows that he has put the ones that he loves the most at risk – placing them

13   into instability and grief. *Id*. Mr. Costello's regret is that his son will not have a father

14   for the precious early years of his life; that he "will not have the man to look up to that

15   every child should have." *Id*. Mr. Costello states that, "I have taken away what I could

16   have given [him] as a father who loves his son. I am so very sorry." *Id*. Although he

17   acknowledges that it may be a strained relationship, Mr. Costello hopes for the

18   opportunity to be involved in his son's life in the future. *Id*.

19       Mr. Costello is also recently married. In 2020, Mr. Costello married Katrina

20   Rosseini. Mr. Costello understands that the repercussions for his actions are necessary

21   to uphold and promote respect for the law. However, he is still coming to terms with

22   being away from his wife, to whom he is distraught about putting through this ordeal.

23   *Id*. Ms. Rosseini has been both emotionally and professionally impacted by the

24   repercussions of Mr. Costello's actions. Exhibit 1 (Support Letters). Yet, Ms. Rosseini

25

26

believes that there is good in Mr. Costello and that he has a big heart, and thus she hopes they can one day soon continue their lives together. *Id.*

### III. A TEN-YEAR SENTENCE IS SUFFICIENT TO ACHIEVE THE GOALS OF SENTENCING.

Following *United States v. Booker*, 543 U.S. 220 (2005), sentencing courts are no longer bound by the United States Sentencing Guidelines. The guidelines are neither mandatory nor presumptively reasonable. *Kimbrough v. United States*, 552 U.S. 85 (2007). Rather, sentencing courts must consider the advisory guidelines, the sentencing factors set forth in 18 U.S.C. § 3553(a), and the dictate that the sentence be "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *See* 18 U.S.C. § 3553(a). In other words, a court must impose the minimum term necessary to comply with the goals of sentencing. *Id*; *accord* 18 U.S.C. § 3582. Furthermore, the advisory range established by the Sentencing Guidelines are not presumed reasonable, in part because they do not take into account all the § 3553(a) considerations. *See Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable") (per curiam).

>    **A.** **While the nature of the offense is undoubtedly serious, a ten-year sentence is also a very serious term of imprisonment. A 13-year sentence is greater than necessary to reflect the seriousness of the offense.**

Mr. Costello acknowledges the seriousness of his offense conduct and the financial and emotional harm he caused to others. Although the offense conduct in this case is very serious, that does not necessarily mean that a long prison sentence is required. The justice system can acknowledge the seriousness of an offense without necessarily imposing an even more severe prison sentence. The idea that the length of a prison term is the only way to measure the seriousness of a crime is false. Prison is not

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 9

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    the only means to impress upon society, or a defendant, that society abhors the

2    underlying criminal conduct. A 13-year term does nothing more than a ten-year term to

3    impress upon everybody, including the defendant and the victims, that the justice

4    system condemns such crimes.

5        Mr. Costello agrees with the Probation Department's characterization of the

6    victim impact letters; they are powerful and heartbreaking.[3] In addition to the loss of

7    money, many victims have endured emotional losses, delayed retirement, and a loss of

8    trust. Mr. Costello acknowledges the myriad of ways in which he harmed people.

---

[3] There are several victim-impact statements that address matters either unrelated to this case or beyond the scope of the relevant conduct in this case.

    One such letter is from an individual named, T.M., the owner of a CBD business who started working with Mr. Costello in 2016. In response to counsel's inquiry about this letter, the government stated, "Based upon our review of the evidence, we did not include [T.M.] as a victim in our case. He did, however, choose to submit his own statement." The Court should not consider this letter.

    Another letter was submitted by J.M. who claimed to be a controller for Mr. Costello and said that she lost wages and equipment. In a response to an inquiry, the government stated, "This [individual] . . . was a bookkeeper at Hempstract. We are not seeking recovery of the $30,000 as restitution in Mr. Costello's case. She did, however, choose to submit her own statement." The Court should also not consider this letter.

    A letter was submitted by D.S. and addressed losses from an investment in Aurora Cannabis Company, a company that is not related to this case or Mr. Costello, although the government notes D.S. was identified as a GRNF investor who suffered some net loss.

    Another letter was submitted by T.W.F. who described losses of $2.5 million dollars from a hijacked brokerage account, which has nothing to do with Mr. Costello. In response to an inquiry, the government stated, "This person was identified as a GRNF investor who suffered a net loss. It does appear that the bulk of his statement applies to some *unrelated* fraudulent conduct" (emphasis added).

    Another letter, submitted by M.S., attributes her husband's suicide to Mr. Costello's actions. Mr. Costello feels heartbroken about this person's death. The causes of suicides are often complex and multi-faceted, especially during the COVID pandemic. The letter fails to establish a causal connection between Mr. Costello's offense and this person's tragic suicide.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

However, the Probation Department recommended sentence overstates the seriousness of the offense.

> **1.   The Probation Department recommendation is too severe when compared to the advisory range for other serious violent offenses.**

The Probation Department's recommendation places the seriousness of this offense alongside far more egregious crimes. A sentence of 156 months would be consistent with, or close to, the advisory range for the following offenses:[4]

- Murder, Second Degree (Total Offense Level 35), 168-210 months;
- Attempted First Degree Murder (TOL 30), 97-121 months;
- Aggravated Sexual Abuse (TOL 35), 168-210 months;
- Kidnapping with Permanent Injury (TOL 33) 135-168 months;
- Sex Trafficking with Coercion (TOL 35) 168-210 months.

This is just a small sampling of more serious offenses that would result in an advisory range consistent with the Probation Department recommendation. These types of offenses involve severe premeditated physical harm that is immediately visible at the time the offense is committed. These violent offenses with advisory ranges consistent with the Probation Department recommendation demonstrate that the Probation recommendation overstates the severity of Mr. Costello's offense.

> **2.   The loss amount, $35 million, does not represent Mr. Costello's gain. A very small portion of the total loss amount went directly to Mr. Costello.**

Mr. Costello does not dispute the agreed upon loss amount in this case. He also recognizes that the victims suffered very real financial loss. However, this Court should be mindful of the manner in which the loss amount is calculated in this case.

The $35 million loss in this case consists of three categories: (1) trading losses of $25 million in GRNF by investors buying/selling stock at a net loss; (2) individuals

---

[4] The following ranges assume a guilty plea, acceptance of responsibility, and CHC I.

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 11

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

who invested about $6 million in Hempstract, based on false statements by Mr. Costello; (3) a pump/dump scheme where investors lost about $600,000; and (4) about $3.7 million that Mr. Costello diverted from marijuana companies using his banking services. PSR ¶¶ 40-42.

The overwhelming majority of the loss amount, $25 million, is attributed to trading losses by investors in GRNF, a publicly traded company. These are people who invested in GRNF and the value of their stock fell. GRNF was an active over the counter stock. Some investors made money and others lost money. The gains from other investors, however, are excluded from the loss amount calculation.

Mr. Costello accepted responsibility early in this case and waived valid legal issues related to the trading loss amount. This demonstrates his sincere acceptance of responsibility. Mr. Costello could have taken a far more litigious approach to this case but opted to plead guilty before a trial continuance. In regard to the $25 million trading loss amount, he could have argued that the government had to prove by clear and convincing evidence that the losses were attributed to Mr. Costello's fraudulent misrepresentation. *See United States v. Lonich*, 23 F.4th 881, 911-917 (9th Cir. 2022) (In fraud case, government must prove by clear and convincing evidence that defendant's fraud caused the specific loss alleged.). Here, Mr. Costello could have required the government to prove that each of the 7,553 investors who suffered a net loss purchased the stock as a result of Mr. Costello's false statements. *See United States v Stein*, 846 F.3d 1135, 1153-56 (11th Cir. 2017) (In proving loss amount, government must show "but-for causality," meaning the government must prove the investor relied on the fraudulent information and the court must consider whether intervening events which contributed to the loss were reasonably foreseeable to the defendant.). To be clear, Mr. Costello is not challenging the loss or restitution amounts. He is simply pointing out that by taking responsibility for the full loss amount requested by the

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 12

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

government, he waived significant factual and legal issues that could have impacted both the guideline range and the restitution amount.

Mr. Costello never divested his own shares of GRNF. He did not profit by the inflated price of the stock. While Mr. Costello engaged in a separate pump/dump scheme, he did not do so with GRNF.

Of the remaining $10 million in loss, most of that money was put back into Mr. Costello's businesses. After receipt of the draft PSR, counsel contacted the government to determine its view of the "actual gain" by Mr. Costello. The government acknowledged that investigators could not really trace how much money that was personally received by Mr. Costello, except for the $625,000 from the pump and dump activity. The government noted that several million dollars went to benefit Mr. Costello's businesses and, thus, benefitted him. Mr. Costello does not dispute that he used significant funds for his own benefit. He lived in a high-end rented home[5] and he owned a very expensive car.[6]

Again, counsel does not raise these issues to minimize the loss of the victims. The issues surrounding the loss amount are raised to demonstrate that only a small percentage of the very high loss amount went directly to Mr. Costello. In this way, the loss amount is a poor proxy for grading the seriousness of the offense. Nonetheless, Mr. Costello quickly took responsibility and accepted the loss amount calculated by the government.

---

[5] When speaking with defense counsel, the government noted the rent was high, about $5,000/month, but indicated it was not "a mansion."

[6] The PSR, at ¶ 111, incorrectly states that Mr. Costello "maintains" a safe deposit box at a bank in San Diego. This box is not currently held, and Mr. Costello believes it was closed.

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### 3. The advisory guideline range overstates the seriousness of the offense.

The fraud guidelines, USSG § 2B1.1, have been the subject of criticism by professors and federal judges for years. As stated in a recent law review journal, the fraud guideline section "routinely recommends arbitrary, disproportionate, and often draconian sentences to first-time offenders of economic crimes" which has led "many judges to lose confidence entirely in the guideline's recommended sentences." Boss and Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, Ohio State Journal of Criminal Law, Volume 18:2, 605-631, 606-06 (Spring 2021);[7] *see also United States v. Gupta*, 904 F.Supp.2d 349 (S.D. NY 2012) (The fraud guideline "does not take adequate account of the factors this Court is required by law to consider in imposing sentence."); *United States v. Corsey*, 723 F.3d 366, 377-78 (2nd Cir. 2013) (Underhill, J., concurring) ("[T]he loss guideline is fundamentally flawed, especially as loss amounts climb."), *citing* Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent'g Rep. 167, 168 (2008) ("For the small class of defendants ... convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.").

In U*nited States v. Adelson*, Judge Rakoff began his sentencing opinion in a fraud case by stating:

> This is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law.

441 F.Supp.2d 506, 506 (S.D.N.Y. 2006). In *Adelson*, like here, the defendant was convicted of fraud, but the district court chose to significantly depart from the

---

[7] Available at https://moritzlaw.osu.edu/sites/default/files/2021-10/how%20the%20economic.pdf

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 14

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

guidelines range on account of "the inordinate emphasis the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss." *Id*. at 509. The Court continued:

> As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective," tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.

*Id*. (citing Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). Rather than impose the 15-30 year sentence requested by the government, Judge Rakoff imposed a sentence consisting of 42 months of incarceration followed by two years of supervised release where the amount of loss was calculated as between $50 and $100 million. *Id*. at 507-510.

One of the reasons why the range is so high in this case has to do with the structure of the sentencing table itself. At the low end, point enhancements add very small increments to the range. At base offense level 6, for example, the first two additional points add nothing at all to the range of 0 - 6 months. As one goes up the chart, however, each point causes a bigger and bigger jump in months. By the time one gets to the upper reaches of the table, the addition of a single point, from level 37 to 38, adds over two years to a person's prison range.

What this shows is that not all points are equal. As each enhancement is piled on, the points themselves are added arithmetically, but the months and years they represent increase almost geometrically. A guideline like the fraud guideline is especially problematic. It starts very low and then is almost entirely driven upward by its enhancements. Any one enhancement, standing alone, may make perfect sense. Yet, cumulatively, they apply in a way that makes no sense in many cases. That is partly because each enhancement is itself enhanced by the ones that precede it. A two-level

sophisticated means enhancement, added at the low end of the scale, with no other enhancements, adds zero to the guideline range. Coming on top of all the other enhancements in this case, it adds three years to the sentence (level 34 to 36), even though it is the same two-level enhancement.

How did it suddenly become so much more potent? It is as if the framers of the guidelines decided to adopt a bowling method of scoring. Three consecutive strikes add up to more than thirty points, because each strike counts once for itself and once again for the succeeding strikes. Under such a scheme, it is all too easy to find oneself striking out. The only upward limit, it seems, is the human lifespan.

Consider Ms. Costello's situation. He is in CHC I. His crime is entirely nonviolent. Yet, his offense level puts him at the level of a murderer, because of a flawed mechanical formula. Reliance on the guidelines, in this instance, produces not justice, but nonsense.

### B.      Mr. Costello's history and characteristics warrant no more than a ten-year sentence.

Mr. Costello is 42 years old. The offense conduct in this place took place over a period of approximately three years, November 2018 to June 2021. He has minimal criminal history and nothing in his history would have predicted this fraud offense. Indeed, the Probation Department recommendation states, "Based on Mr. Costello's personal background and history of employment before this time, there was no indication he would embark" on this fraudulent course of business. Probation Rec., at 4-5. For the vast majority of his adult life, he has worked hard and played by the rules. He should not be defined solely by his crime.

Mr. Costello's family and friends tell the story of a kind-hearted, hard-working, generous man who loves his family. Exhibit 1 (Support Letters). They are genuinely surprised to learn of Mr. Costello's crimes. *Id*. His cousin Dan Pawlus suggests that Mr.

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 16

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Costello was influenced by other role models in the business world who advanced by taking aggressive risks "to push the boundaries of moral business practices." *Id.* Mr. Costello explains his offense conduct as a series of decisions where he tried to do too much, got way over his head, and he started to tell lies to cover up his failures. PSR, Mr. Costello's Letter to the Court. The COVID epidemic then made things even worse, and his conduct escalated. *Id.* He admits he was greedy and "blinded by the glamour and by the money." *Id.* At the time, he was also abusing alcohol to cover up his depression. PSR ¶ 97. Like his family and friends, Mr. Costello knows he can be a better person. His family and friends see great potential in him, as someone who, "at his root, [] is a good human being." Exhibit 1 (Benjamin Cadranel letter).

Mr. Costello agrees he deserves a term of imprisonment. However, he is not a person who must be caged because he is beyond repair or redemption. As he states in his letter to the Court, he "will not let his failings define" him. PSR, Mr. Costello's Letter to the Court. He recognizes that he has much work to do on himself so that he will "never again falter as" he has here. *Id.* He hopes to be the type of person who God has called him to be and a positive role model for his son. *Id.*

### C. A sentence longer than ten years is not necessary to protect the community.

Protecting the community is the most important factor in any sentencing hearing. By any objective measure, Mr. Costello's risk of recidivism is extremely low. Upon his eventual release from a ten-year prison term, he will be subject to a long term of supervised release; he will be likely be barred from holding a position with any publicly traded company; and his reputation is so tarnished that he will likely not be in a position to commit a similar offense in future.

Mr. Costello's age, criminal history category, and type of offense suggest a low risk of recidivism. Mr. Costello is 42 years old. Assuming he earns good time credits,

1   he will be about 50 years old after serving a ten-year sentence. The United States

2   Sentencing Commission ("Commission") recidivism studies have shown a "federal

3   offender's age at time of release into the community was [] closely associated with

4   differences in recidivism rates[,]," with rates significantly declining as the person gets

5   older. USSC, *Recidivism Among Federal Offenders: A Comprehensive Overview*

6   (March 2016), at 5 (hereinafter, *Recidivism Study*). Many courts have explicitly

7   considered age in imposing sentencing on the ground that older defendants exhibit

8   markedly lower recidivism rates in comparison to younger defendants. *See United*

9   *States v. Holt*, 486 F.3d 997, 1004 (7th Cir.2007); *United states v. Cabrerra*, 567

10  F.Supp.2d 271, 279 (D.Mass.2008); *United States v. Vigil*, 476 F.Supp.2d 1231, 1316

11  (D.NM.2007) (recognizing the correlation between age and the risk of recidivism as a

12  mitigating factor); *Simon v. United States*, 361 F.Supp.2d 35, 40 (E.D.N.Y. 2005)

13  ("Guidelines fail to consider that recidivism drastically declines with the defendant's

14  age").

15      Other factors weigh strongly against recidivism for Mr. Costello. He is in

16  Criminal History Category I. Offenders in Criminal History Category I have the lowest

17  rates of recidivism. *Recidivism Study*, at 18, 19. Offenders convicted of fraud offenses

18  have, by far, the lowest recidivism rates among every offense category. *Id*. at 20. Mr.

19  Costello is a college graduate. The Commission has found that college graduates have

20  the lowest recidivism rate among educational level groups. *Id*. at 24.

21      Finally, a 13-year sentence will do nothing to further protect the community.

22  According to the Commission, with the exception of very short sentences (less than 6

23  months), the rate of recidivism varies very little by length of prison sentence imposed,

24  and the total offense level "appears to not be correlated with recidivism." *Id*. at 20, 22.

25  //

26

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 18

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**D.      A sentence longer than ten years would create sentencing disparities.**

In constructing a sentence in Mr. Costello's case, this Court must strive to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  In particular, this Court should look to past sentences imposed in this district for offenders convicted of similar offenses following a guilty plea. When measured against other cases in this district, a ten-year sentence is warranted. Illustrative cases include the following:

- **Nino de Guzman, CR11-245-RSL, ten-year sentence, $25 million in loss.**

In *United States v. Nino de Guzman*, the defendant's fraud offense resulted in a loss amount of $25 million. CR11-245-RSL, dkt 120 (Government's Sentencing Memo) at 11. In many respects, Mr. Nino de Guzman's offense conduct was far more serious. The money was paid by investors directly to accounts controlled by the defendant. *Id*. To say Mr. Nino de Guzman's lifestyle was extravagant would be an understatement. In 2008, he spent over $600,000 on clothing/jewelry, $600,000 for a yacht, over $300,000 on vehicles, a $1.8 million home, over $5,800/month on a Los Angeles penthouse for a girlfriend, over $800,000 on nightclubs and restaurants, $250,000 on a personal assistant, and over $250,000 on a luxury box for Seahawks games. *Id*. 8-11.

- **Bernard Ross Hansen, CR18-092-RAJ, 11-year sentence, $30 million loss.**

In *United States v. Hansen*, the defendant's long-term Ponzi-like scheme resulted in losses of over $30 million to customers and vendors of his precious metals mint company. CR18-092-RAJ, dkt 448 (Government Sentencing Memo), at 1. Mr. Hansen, who had two prior federal felony convictions, was found guilty after a lengthy trial, absconded prior to sentencing, and was arrested with three loaded firearms. Dkts 448, 476 (Supplemental Sentencing Memo). While an 11-year sentence is longer than the joint recommendation in this case, Mr. Hansen's prior serious criminal history,

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 19

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

failure to take responsibility, flight prior to sentencing, and his subsequent possession of firearms while on warrant status are extremely aggravating factors that are not present in this case.

More recently, Elizabeth Holmes was sentenced in the Northern District of California to 11 years of imprisonment following a trial where the loss amount was $121 million.[8] Attached as Exhibit 2 is a table which includes sentences in other securities fraud cases involving high loss amounts. The vast majority of the cases with even higher loss amounts than this case resulted in lower sentences.

### E.    The Probation Department recommendation does not accord enough weight to the parties' plea agreement.

The Probation Department asserts that it considered the plea agreement in this case. However, it recommends a sentence that is one-third longer than the joint recommendation, a huge departure from the plea agreement, based on no new information that was not available to the government at the time of the plea agreement.

Before extending an offer of a joint 10-year recommendation and entering into the plea agreement, the government had investigated the case thoroughly, met with victims, and looked at other cases in this district to avoid disparities. The Probation recommendation fails to consider the time and resources the government has spent on this case.

The Probation Department recommendation also promotes inefficiency in the criminal legal system. Plea agreements such as this promote some level of certainty. Without some degree of predictability, it would be extremely difficult to resolve cases short of trial. This is particularly true in fraud cases such as this which involve

---

[8] *See* Allyn, *How Silicon Valley fervor explains Elizabeth Holmes' 11-year prison sentence*, NPR, 11/23/22, available at https://www.npr.org/2022/11/23/1138477784/elizabeth-holmes-sentenced-11-years-explained

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 20

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

extremely voluminous discovery, hundreds of potential witnesses, and expert witnesses. By accepting a joint ten-year sentence, not only did Mr. Costello quickly accept responsibility, but he also saved the government, the Court, and the Federal Defenders an incredible amount of time and money. In doing so, Mr. Costello forfeited his right to not only challenge his guilt, but also challenge the loss amounts. The typical fraud case involving large loss amounts takes years to resolve either by plea or by trial. Mr. Costello took responsibility without any trial continuance.

To be clear, Mr. Costello understands that the plea agreement does not bind the Probation Department or this Court. Nonetheless, this Court should give significant weight to the plea agreement in light of the government's in-depth knowledge of the case, the plea agreement, and similar cases cited above.

### F. General deterrence.

A custodial sentence necessary to achieve the goal of general deterrence. Research has refuted the notion of marginal general deterrence, i.e., that more severe sentences serve as a general deterrent to crime. As one criminologist concluded there is "no real evidence of a deterrent effect for severity." R. Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010). "The fallacy that is marginal general deterrence is highlighted by the fact that nearly 90% of criminologists believe that it does not work, which is similar to the scientific consensus relating to the causes of global warming." Mirko Bagaric, Victoria Lambropolous, Lidia Xynas, *Excessive Criminal Punishment Amounts to Punishing the Innocent: An Argument for Taking the Parsimony Principle Seriously*, 57 S. TEX. L. REV. 1, 28 (2015).[9]

---

[9] *See also* National Institute of Justice, *Five Things About Deterrence*, U.S. Department of Justice, Office of Justice Programs (July 2014) (summarizing Daniel Nagin, *Deterrence in the 21st Century*, Crime and Justice in America: 1975-2025 (ed. Michael Tonry, University of Chicago Press, 2013)).

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 21

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

### G.      Retributive justice does not warrant a 13-year sentence.

A ten-year term of imprisonment is a serious sentence by any measure. Many victims believe a much longer sentence is warranted. While understandable, an additional three years in prison will not restore the victim's trust in financial markets or others. It will not restore lost savings and will only cost taxpayers significant sums to house another prisoner who has a very low risk of recidivism. Given the expected restitution amount, nobody believes that Mr. Costello will be able to make the victims whole. However, to the extent that there will be some restitution paid, an extra three years in prison will only reduce that amount returned to investors.

Mr. Costello will be punished in other ways beyond a ten-year prison sentence as the parties recommend. He will have an extraordinary restitution order. The government will take any remaining assets through the agreed forfeiture. He will be placed under supervision for three years. He will likely be barred from being an officer in a publicly traded company and he will carry the lifelong label of "felon" and all of its attendant consequences. The Court should also consider the persistent punishment flowing from the collateral consequences. As a former federal prisoner and current law professor explains it,

> When you walk out of prison, you come to realize the punishment never ends. Even if a defendant is sentenced to no prison time, there are still thousands of collateral consequences flowing from a federal felony conviction. People with felony convictions may be legally discriminated against in employment, housing, federal benefits, and voting rights. They can be shut out of professions, including the legal profession. They can be saddled with legal financial obligations, such as fines or restitution, hovering over their head for decades.

Shon Hopwood, *Improving Federal Sentencing*, 87 UMKC L. Rev. 79 (2018) (footnote omitted). In addition, he will rightfully continue to suffer the shame and indignity of

DEFENDANT'S SENTENCING
MEMORANDUM
(*US v. Costello*, CR22-160RSM) - 22

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

being a convicted felon. He certainly deserves such shame, but it should not be lightly discounted.

## IV.    CONCLUSION

By statute, this Court is required to impose the minimum term necessary to achieve the goals of sentencing. A term longer than ten years would be inconsistent with this directive.

Mr. Costello is deeply sorry for his conduct and the impact it has had on the lives of so many people. He is a 42-year-old man with very limited criminal history. For most of his life and, for the first 15 years of his professional career, there was no indication he would put himself in this situation. His family and friends acknowledge the serious nature of the offense, but they also describe Mr. Costello as a caring and thoughtful man. While a ten-year prison term is warranted in light of the seriousness of the offense, any term of incarceration is not necessary to protect the community.

This Court should give significant weight to the recommendations in the plea agreement. Mr. Costello took responsibility early in this case and accepted all of the government's requests for the loss amount, restitution amount, and forfeiture. The plea agreement and the joint ten-year recommendation accurately balances the sentencing factors this Court must consider.

Finally, Mr. Costello requests a judicial recommendation for Lompoc and participation in the RDAP program.

DATED this 12th day of May, 2023.

Respectfully submitted,

s/*Dennis Carroll*
Assistant Federal Public Defender
Attorney for Justin Costello

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**